1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    BRANDEN FRIESON,                    Case No.  16-cv-04335-DMR
                    Plaintiff,
8                                        **ORDER RE CROSS-MOTIONS FOR**
              v.                         **SUMMARY JUDGMENT**
9
     NANCY A. BERRYHILL,                 Re: Dkt. Nos. 16, 18
10
                    Defendant.
11

12          Plaintiff Branden Frieson ("Plaintiff") moves for summary judgment to reverse the

13   Commissioner of the Social Security Administration's (the "Commissioner's") final

14   administrative decision, which found Plaintiff not disabled and therefore denied his application for

15   benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*.  The

16   Commissioner cross-moves to affirm.  For the reasons stated below, the court **GRANTS IN PART**

17   and **DENIES IN PART** Plaintiff's motion for summary judgment and **GRANTS IN PART** and **DENIES IN**

18   **PART** the Commissioner's cross-motion for summary judgment.

19   **I.      PROCEDURAL HISTORY**

20          Plaintiff is currently 22 years old.  He received Supplemental Social Security Income

21   ("SSI") as a child from July 22, 2002 until he reached the age of 18 on October 29, 2012, at which

22   point he was no longer eligible to receive SSI child benefits.  Administrative Record ("A.R.") 92-

23   93.  On November 16, 2012, Plaintiff filed an adult application for Social Security Disability

24   Insurance (SSDI) benefits.  A.R. 78.  His application was initially denied on May 24, 2013 and

25   again on reconsideration on September 5, 2013.  A.R. 98, 109.  On November 4, 2014, Plaintiff

26   filed a request for a hearing before an Administrative Law Judge (ALJ).  A.R. 21.  ALJ John

27   Flanagan held a hearing on June 18, 2014 during which Plaintiff appeared and testified, along with

28   vocational expert (VE) Linda Ferra.  A.R. 40-65.  Following the hearing, the ALJ held the record

open pending a sleep study, A.R. 64, which was later included in the record.  A.R. 506-09.

After the hearing, the ALJ issued a decision finding that Plaintiff was not disabled.  In relevant part, the ALJ determined that Plaintiff was 18 years old on the amended alleged onset date of disability, and therefore is considered a "younger person" within the meaning of the Social Security regulations (*see* 20 C.F.R. § 414.963(c)).  A.R. 34.  The ALJ found that Plaintiff has the following severe impairment: borderline intellectual functioning with a full scale IQ of 69, *see* 40 C.F.R. § 416.920(c).  A.R. 27.  The ALJ further concluded that Plaintiff's education level was marginal; specifically, Plaintiff had at least a high school education, and was able to communicate in English, but received special education services.  A.R. 34.  The ALJ determined that Plaintiff retained the following residual functional capacity (RFC):  Plaintiff can perform the full range of work at all exertional levels, but is restricted to simple repetitive tasks done by rote with very little, if any, exercise of independent judgment, and can only perform work of a nonproduction nature with no high quotas or fast pace.  A.R. 30.  The ALJ also relied on the opinion of the VE, who testified that an individual with such an RFC could perform other jobs existing in the economy, including commercial cleaner and cleaner/housekeeper.  A.R. 35.  The ALJ concluded that Plaintiff is not disabled.  A.R. 35.

The Appeals Council denied Plaintiff's request for review on June 3, 2016.  A.R. 1.  The ALJ's decision therefore became the Commissioner's final decision.  *Taylor v. Comm'r of Soc. Sec. Admin*., 659 F.3d 1228, 1231 (9th Cir. 2011).  Plaintiff then filed suit in this court pursuant to 42 U.S.C. § 405(g).  Compl. [Docket No. 1].

## II.    THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1]  and that is expected to result in death or to last for a continuous period of at least twelve months.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he or she previously

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

performed and incapable of performing any other substantial gainful employment that exists in the

national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. §

423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20

C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the

claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's

impairment(s). If the claimant does not have a severe medically determinable physical or mental

impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of

impairments that is severe and meets the duration requirement, the ALJ will find that the claimant

is not disabled.

3. At the third step, the ALJ also considers the medical severity of the claimant's

impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20

C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will

find that the claimant is disabled.

4. At the fourth step, the ALJ considers an assessment of the claimant's residual

functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his

or her past relevant work, the ALJ will find that the claimant is not disabled.

5. At the fifth and last step, the ALJ considers the assessment of the claimant's RFC

and age, education, and work experience to see if the claimant can make an adjustment to other

work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is

not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the

claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Plaintiff's Testimony

Plaintiff gave the following testimony at the hearing: Plaintiff was born on October 29,

1994 and was 19 years old as of the date of the hearing. A.R. 45. He is 6'5", weighs over 400 pounds, and is right-handed. A.R. 49-50. Plaintiff graduated from a continuation high school, but did not pass the school exit exams. All of his classes were special education classes. A.R. 45-46, 48. Plaintiff testified that he has difficulty reading; the last time he read a book or magazine for enjoyment was 2013. A.R. 46. As of the hearing, Plaintiff had no income other than county general assistance and food stamps. A.R. 50, 53-54.

Plaintiff lives with his mother and sister. A.R. 50. At home, he takes out the trash, sweeps the floor, and cleans the bathroom. A.R. 51. On a typical day, Plaintiff sleeps during the day, and at night, he sits and watches TV. A.R. 54. He has a computer and iPhone that he uses to play games. A.R. 47. Plaintiff also testified that he uses his iPhone to post messages on Facebook. A.R. 47. According to Plaintiff, he has more than a dozen friends on his Facebook account, some of whom he used to hang out with, but did not hang out with anymore. A.R. 47, 52. Plaintiff does not go out socially with other people because he does not like going outside much. A.R. 52. He does not have a driver's license because the driver's license test was too difficult. He failed the written test twice, and has since given up trying to get his license. A.R. 53. Plaintiff testified that he no longer wants to attend community college and work in automobile mechanics because there is a lot of math involved and he is not good at math. A.R. 56.

Plaintiff's only past work experience was in 2010 in a job training program with Youth Employment Partnership, where he stapled papers and put them into different piles. A.R. 48. Plaintiff testified that he believes that he cannot work because he cannot be around other people. A.R. 50.

Plaintiff had trouble in school because he could not stay in one place and had problems with everyone. A.R. 51. Plaintiff has relatives, but does not speak to them because he "just [doesn't] feel like it." A.R. 52. Plaintiff also does not speak with his neighbors because he "just [doesn't] like talking to them." A.R. 53.

Plaintiff testified that he was not in group therapy because it "didn't do anything." A.R. 54. He was prescribed and was taking sumatriptan and propranolol for his headaches, but his prescription expired last month. A.R. 55. Plaintiff had to undergo a sleep study for his headaches.

A.R. 56. According to Plaintiff, his doctor talked to him about a CPAP machine, but did not say whether Plaintiff needed one. A.R. 56.

**B.    Relevant Medical Evidence**

**1.    Stars Behavioral Health Group**

The Stars Behavioral Health Group ("Stars") operates the Stars Day Treatment Intensive Special Education Program. The Stars Day Treatment Special Education Program is a high school special education program that provides, among other things, intensive mental health services including, but not limited to, weekly individual and group therapy sessions. Plaintiff was enrolled in the Stars high school special education program from September 2009 to July 2013. A.R. 412-13.

**a.    Psychiatrist Farhan Numah, M.D.**

Stars psychiatrist Dr. Farhan Numah evaluated Plaintiff twice, on February 23, 2011 and April 13, 2011. A.R. 468-75.

On February 23, 2011, Dr. Numah described Plaintiff's history of present illness as follows: Plaintiff was a 16 year old who was significantly obese with a history of dysthymia. A.R. 468. Plaintiff reported that he felt tired all the time, had low energy and no motivation, wanted to sleep all the time, and was missing school lately. A.R. 468. Plaintiff also reported that he went to sleep around 1 or 1:30 a.m. and slept for approximately 5-6 hours. A.R. 468. Plaintiff reported that he felt like he was not doing anything with his life and had no life goals. A.R. 468. Dr. Numah noted that Plaintiff had seen a psychiatrist since he was 12 years old for ADD (Attention Deficit Disorder). A.R. 472. Dr. Numah also noted that Plaintiff got along well with friends. A.R. 471. Dr. Numah further observed the following regarding Plaintiff's mental status: Plaintiff was cooperative; his memory/concentration was fair; his mood was OK; his affect was flat; his thought process was linear; his speech rate and volume were normal; his insight was fair; and his judgment was fair. A.R. 473. Dr. Numah stated that his overall impression of Plaintiff was dysthymia. A.R. 473. Dr. Numah also incorporated prior diagnoses by another clinician including the diagnosis of generalized anxiety disorder into this treatment note. A.R. 470. Dr. Numah established certain objectives to decrease the frequency of Plaintiff's anxiety/worry and school

United States District Court
Northern District of California

avoidance/refusal, to increase Plaintiff's assertiveness, and to have Plaintiff use coping skills to manage situations. A.R. 474. Dr. Numah also explained the risks, benefits, and alternatives to medications to Plaintiff. A.R. 473. According to Dr. Numah, Plaintiff was "not interested in meds" and "understood and agreed with the plan to hold off on meds for now." A.R. 473.

On April 13, 2011, Dr. Numah noted that Plaintiff reported no change in his health and described Plaintiff's history of present illness as nearly identical to that on February 23, 2011. A.R. 468. Dr. Numah noted that Plaintiff stated: "I don't feel . . . I need medication" and further reported that "he doesn't want to take medications." A.R. 468. Plaintiff's past psychiatric history, peer history, mental status, current diagnoses, objectives, and visit-plan were unchanged from the February 23, 2011 visit. A.R. 468-70. Dr. Numah continued to incorporate prior diagnoses by another clinician including the diagnosis of generalized anxiety disorder in this treatment note.

### b. Therapist Paul Mason, MFT-1

In connection with Plaintiff's January 2012 Individualized Education Program ("IEP"), Stars therapist Paul Mason noted that Plaintiff shuts down when he is frustrated or feeling tired with his work by putting his head down and sleeping. A.R. 254. Mr. Mason also noted that Plaintiff exhibited poor concentration and participation during groups and activities, and expressed feelings of boredom. A.R. 254. Mr. Mason found that this behavior kept Plaintiff away from academic instruction because Plaintiff lacked "the motivation to do the work due to being tired." A.R. 254.

In his therapy notes, Mr. Mason observed that Plaintiff exhibited excessive worrying and fear; had difficulty remaining in the group setting and often got up and walked out of the group on a daily basis; shut down when he was redirected by staff and held accountable; appeared to internalize his feelings; became overwhelmed and anxious; wrestled with his peers, pushed, shoved, and threw objects at others; was unable to focus and concentrate in the program due to his lack of energy; and had attendance problems and was unable to attend the program more than 3 days on average per week. A.R. 381, 383. Mr. Mason further noted that while Plaintiff made progress on certain objectives, he "struggle[d] to remain engaged in groups and process his feelings with peers and staff." A.R. 381. Mr. Mason also noted that Plaintiff continued to

struggle with his inability to concentrate, which did not appear to be influenced by his fatigue. A.R. 383.

### c.  Therapist Katharine Kaftanski, ASW

In February 2013, Stars social worker Katharine Kaftanski observed the following about Plaintiff: Plaintiff experienced difficulty concentrating on assigned tasks throughout the day; was unable to focus on his task, and could not concentrate when the general noise levels increased or he was surrounded by multiple individuals at one time; was unable to problem solve and/or implement coping skills to help him mediate noisy/overwhelming environments; often gave up on his assigned tasks and reported that he was bored and did not want to be in the program; and continued to socially withdraw at various times during the program. A.R. 385, 387. Ms. Kaftanski diagnosed Plaintiff with generalized anxiety disorder, among other conditions, and assigned him a GAF[2] score of 40. A.R. 388-389.

In June 2013, Ms. Kaftanski completed a discharge summary for Plaintiff from the Stars program. A.R. 412-13. Ms. Kaftanski diagnosed Plaintiff with generalized anxiety disorder, dysthymic disorder, and hyperkinetic syndrome, and assigned him a GAF score of 40. A.R. 413. Ms. Kaftanski observed the following: Plaintiff largely struggled with social anxiety; continued to socially withdraw when he felt overwhelmed and left early from the program when he was unable to identify and implement the coping skills discussed and practiced in individual therapy; and was unable to leave his house at times due to feeling overwhelmed. A.R. 412. Ms. Kaftanski recommended that Plaintiff be provided with a small, structured hands-on environment to best suit his needs and support his social/emotional growth. A.R. 412.

//

---

[2] "GAF" stands for Global Assessment of Functioning. The Ninth Circuit recently noted that GAF scores, which are " 'a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment,'" "may be a useful measurement." *Garrison v. Colvin*, 759 F.3d 995, 1002, n.4 (9th Cir. 2014) (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (quotation marks omitted)). A GAF score between 41 and 50 "describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning." *Id*. (internal citations omitted). A GAF score between 51 to 60 "describes 'moderate symptoms' or any moderate difficulty in social, occupational, or school functioning.'" *Id*. (internal citations omitted).

#### d.        School Psychologist Adrianna Jeanpierre

Stars school psychologist Adrianna Jeanpierre observed the following about Plaintiff in connection with his March 2013 IEP:  Plaintiff continued to display symptoms of anxiety, depression and withdrawal, and to exhibit social/emotional difficulties that interfered with his ability to function in the class environment.  A.R. 282.  Ms. Jeanpierre summarized Plaintiff's assessment test results which showed that Plaintiff's overall memory, including visual and audio memory, fell into the deficient range; Plaintiff had much difficulty remembering visual information and regulating his attention/concentration; Plaintiff's short-term auditory memory and auditory cohesion were in the delayed range; and Plaintiff presented with delayed visual perceptual abilities.  A.R. 283.

### 2.        Treating Physician Charles Whitehill, M.D.

Kaiser physician Charles Whitehill, M.D. treated Plaintiff mainly on three occasions, on June 27, 2013, October 2, 2013, and March 26, 2014.  A.R. 437-41, 477-85.

On June 27, 2013, Plaintiff saw Dr. Whitehill for a routine physical examination.  A.R. 437-41.  During this visit, Dr. Whitehill noted that Plaintiff had "appropriate judgment & affect" and his "[m]emory [was] grossly normal."  A.R. 438.

On October 2, 2013, Plaintiff saw Dr. Whitehill for his annual physical and blurred vision in his right eye.  A.R. 482-83.  Dr. Whitehill noted the following in Plaintiff's history of present illness under disability issues: "Previously disabled due to ADD? They have a form for Functional Capacity Assessment.  There is nothing in the Kaiser record to indicate a functional disability."  A.R. 483.  Dr. Whitehill also noted that Plaintiff experienced daily headaches for the last few months for which he used Motrin.  A.R. 483.  Dr. Whitehill also noted that Plaintiff experienced blurred vision for 4 years.  A.R. 483.  Based on his examination, Dr. Whitehill diagnosed Plaintiff with headaches which were "not clearly migraine in nature" and prescribed Plaintiff with Motrin and notriptyline.  A.R. 484.   On the issue of disability, Dr. Whitehill noted that Plaintiff needed a mental capacity assessment which had not been done at Kaiser.  A.R. 484.  Dr. Whitehill also observed that there had "been no recent complaint or care sough[t] for [a] disability mental condition."  A.R. 484.

United States District Court
Northern District of California

On March 26, 2014, Plaintiff saw Dr. Whitehill for headaches. A.R. 477. Dr. Whitehill noted in Plaintiff's history of present illness that he saw Plaintiff last October for a similar complaint and that Plaintiff took the Motrin and Tylenol, which helped, but did not eliminate his headaches. A.R. 478. Dr. Whitehill also noted that Plaintiff started the daily notripyline, but stopped taking it because he felt it was ineffective. A.R. 478. Based on his evaluation, Dr. Whitehill diagnosed Plaintiff with headaches, possibly migraines, but not classic in nature. A.R. 479. Dr. Whitehill prescribed imitrex and propranolol, and noted that if his headaches did not improve, he would refer Plaintiff to a neurologist. A.R. 479.

### 3. Treating Neurologist Lindsay Marie Innes, M.D.

Lindsay Marie Innes, M.D. saw Plaintiff on May 5, 2014 for a follow-up routine visit for headaches. A.R. 510. Upon examination, Dr. Innes noted that it was unclear whether Plaintiff's headaches were a primary headache syndrome like atypical migraines or were secondary to another issue such as sleep apnea or depression. A.R. 512. Dr. Innes ordered a sleep study and indicated that she would treat Plaintiff if the results of the sleep study were positive. A.R. 512. According to the medical records, Plaintiff underwent a sleep study on June 30, 2014. A.R. 506-09. The result of the sleep study was that mild sleep apnea was present, and that a follow-up would be arranged. A.R. 505. There are no records showing that a follow-up with Dr. Innes was ever arranged.

### 4. Examining Psychologist Ahmed El Sokkary, Ph.D.

Ahmed El Sokkary, Ph. D. conducted an in-person consultative evaluation of Plaintiff on April 15, 2013. A.R. 399-401. Dr. Sokkary observed that Plaintiff was able to care for his hygiene, grooming, daily living activities, and that his mother cooked and cleaned. A.R. 399. Dr. Sokkary described Plaintiff's relevant history as including severe behavior trouble in public schools, i.e., being expelled and suspended often from school, and Plaintiff reporting that he was "depressed and anxious about his future and his inability to keep up," and that he tried to complete an occupational computer program at Laney College, but was unable to complete it. A.R. 399. Upon examination of Plaintiff's mental status, Dr. Sokkary noted, among other things, Plaintiff's attitude as "withdrawn and appear[ing] to be internally preoccupied"; that his eyes were downcast;

that his sleep was poor; and that he had been assaulted several times at school and suffered concussions as a result. A.R. 399. Dr. Sokkary conducted a WAIS (Wechsler Adult Intelligence Scale) IQ Test and observed the following results: Plaintiff's full scale IQ of 69 was "in the extremely low range," and his scores on visual working memory indicated a borderline range. A.R. 401. Dr. Sokkary observed that even though Plaintiff completed the trails A test within 41 seconds, he struggled to correctly complete the trails B test, which indicated below than normal psychomotor speed, visual scanning, and mental flexibility. A.R. 401.

Dr. Sokkary concluded that the "overall clinical presentation [wa]s of an individual with extremely low cognitive abilities, with symptoms of anxiety and depression." A.R. 401. Dr. Sokkary diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood and borderline intellectual functioning. A.R. 401. Dr. Sokkary opined the following based on his evaluation and from a strictly cognitive and emotional standpoint: Plaintiff demonstrated a limited capacity and struggled to understand, remember, and perform simple tasks; and Plaintiff struggled to maintain a sufficient level of concentration, persistence and pace which indicated that Plaintiff "would have some difficulty in an environment that [his] health condition would allow." A.R. 401. Dr. Sokkary further opined that Plaintiff was cooperative throughout the evaluation, was capable of adequately communicating, and would be able to interact with supervisors and co-workers with little difficulty. A.R. 401.

### 5. Non-Examining State Agency Medical Consultants

#### a. Preston Davis, PsyD

Preston Davis, PsyD, a state agency medical consultant, conducted an assessment of Plaintiff's mental condition. A.R. 70. Dr. Davis observed that a February 2013 treatment note indicated that Plaintiff "put in little effort" and found that this "suggest[ed] [Plaintiff] did not put forth full effort w/Y testing," and that the "Y test results [were] questionable." A.R. 70. Dr. Davis assessed Plaintiff as moderately limited in his ability to understand and remember detailed instructions; to carry out detailed instructions; to interact appropriately with the general public; and to respond appropriate to changes in the work setting. A.R. 74-75. Dr. Davis opined that Plaintiff could understand, remember, and carry out simple work instructions, and could sustain

10

his concentration, persistence and pace with work tasks for two hour blocks of time, with customary breaks, over the course of a regular workday and work week. Dr. Davis further opined that Plaintiff could interact with supervisors and co-workers he knew well, but would have difficulty interacting with the general public on a consistent basis, and could adapt to a work setting that is simple and routine. A.R. 70, 75.

### b. Patrice Solomon, Ph.D.

Patrice Solomon, Ph.D., a state agency medical consultant, affirmed Dr. Davis's assessment of Plaintiff's mental condition. A.R. 86, 89. Dr. Solomon found the following: that Plaintiff was not mentally retarded and that he lacked adaptive deficits; that his IQ scores "even with poor effort reflect[ed] at least BIF [borderline intellectual functioning] level abilities[;]" that Plaintiff's academic skills were at a 6th grade level, but this was "typical for students who [were] not interested in academics, and truant much of the time[;]" that Plaintiff experienced anxiety/depression, but showed no signs of psychosis; that Plaintiff was not suicidal or in need of psychiatric hospitalization; and that Plaintiff had a history of aggressive behavior toward peers. A.R. 84. Dr. Solomon opined that a "simple work setting with limited social interaction demands would be best suited" for Plaintiff, and that his low motivation was not due to a psychological disorder. A.R. 84.

### C. Vocational Expert (VE) Linda Ferra

At the hearing, the ALJ posed a series of four cumulative hypotheticals to Ms. Ferra. To start, the ALJ provided the following hypothetical to Ms. Ferra: an individual who is 19 years old, has a high school education but is in special education, has no physical restrictions, and has mental restrictions limiting the individual to simple, repetitive tasks, i.e., to jobs that can be done by rote with very little independent judgment, would have few changes, and would be non-production in nature. A.R. 60. Ms. Ferra testified that an individual with such restrictions could perform work as a commercial or institutional cleaner, DOT code 381.687-014, which is an unskilled position with an SVP[3] of 2, and housecleaner DOT code 323.687-014, which is an

---

[3] "'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the

unskilled position with an SVP of 2.  A.R. 61-62.

The ALJ then posed a second hypothetical which included the first, but added the fact that the individual would have occasional (approximately 1/3 of the work day) contact with others, i.e., co-workers, the public, and supervisors.  Ms. Ferra testified that an individual with such restrictions would be able to perform the same work described above.  A.R. 62.

The ALJ then posed a third hypothetical which built on the others, and added that the individual would have occasional contact with others, and that the individual would be unable to maintain concentration, persistence, and pace for up to two hours by himself without direct supervision.  A.R. 62.  Ms. Ferra testified that these facts would change her testimony because a person is expected to perform this work for two hours at a time in the jobs of commercial or institutional cleaner or housecleaner without direct supervision.  A.R. 62-63.  According to Ms. Ferra, an individual with the restrictions in the ALJ's third hypothetical would be precluded from competitive work.  A.R. 63.

The ALJ then posed a fourth hypothetical which built on the others, and added the fact that the individual had recurrent conflicts with co-workers, the public, and supervisors.  A.R. 63.  Ms. Ferra testified that an individual with such restrictions would be unable to perform work as a commercial or institutional cleaner and a housecleaner.  A.R. 63.  According to Ms. Ferra, an individual with these restrictions would need a mediator, facilitator, or job coach.  A.R. 63.

## IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal

---

information, and develop the facility needed for average performance in a specific job-worker situation.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230, n.4 (9th Cir. 2009) (quoting *Dictionary of Occupational Titles*, Appendix C, p.1009 (4th ed. 1991)). "'The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT.'" *Bray*, 554 F.3d at 1230, n.4 (quoting *Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000)).

error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     ISSUES PRESENTED

On appeal, Plaintiff contends that the ALJ erred in 1) evaluating the medical opinions, 2) determining that Plaintiff's testimony was not credible, 3) determining that Plaintiff's ADD and anxiety were not severe at Step Two, 4) determining that Plaintiff's impairments did not meet Listing 12.05(C), (5) determining Plaintiff's RFC, and (6) determining Plaintiff could perform other work at Step Five. Plaintiff requests that the court remand for payment of benefits because all three requirements of the "credit-as-true" rule are met as set forth in *Garrison v. Colvin*, 759 F.3d 995, 1020-21 (9th Cir. 2014).

Defendant cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.     DISCUSSION

### A.   The ALJ's Evaluation of Medical Opinions

Plaintiff first argues that the ALJ erred in weighing the medical opinions. Specifically, Plaintiff contends that the ALJ erred by (1) not affording greater weight to the Stars treaters,

including failing to address the opinion of Stars psychologist Dr. Numah; (2) rejecting the opinion of examining physician Dr. Sokkary; and (3) giving great weight to the opinion of treating physician Dr. Whitehill and substantial weight to the opinions of non-examining state agency consultants Dr. Davis and Dr. Solomon.

### 1. Legal Principles

#### a. Evaluation of Opinions of Acceptable Medical Sources[4]

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians"), and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g., Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81

---

[4] "Only physicians and certain other qualified specialists are considered '[a]cceptable medical sources.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)) (alteration in original omitted); *see also* 20 C.F.R. § 404.1502(a)(1) -(2) (defining "acceptable medical source" as a licensed physician and licensed psychologist).

F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998). An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### b. Evaluation of Opinions of Nonmedical Sources

In addition to medical opinions, the ALJ must also evaluate the opinions of "other sources" or "nonmedical sources." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(c)); 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). A "nonmedical source" is a "source of evidence who is not medical" and includes, but is not limited to, "[e]ducational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers)" and "[p]ublic and private social welfare agency personnel." 20 C.F.R. § 404.1502 (e)(2)-(3). Therapists and social workers are considered "nonmedical sources." *Ghanim*, 763 F.3d at 1161 (a therapist is considered a "nonmedical source"); *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223–24 (9th Cir. 2010) (a social worker is considered a "nonmedical

source").

Nonmedical sources "are not entitled to the same [deference] afforded to 'acceptable medical sources' as defined in 20 C.F.R. § 404.1513(a)." *Bennett v. Colvin*, 202 F. Supp. 3d 1119, 1134 (N.D. Cal. 2016) (citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); 20 C.F.R § 404.1513(a); SSR 06-03p). The ALJ can "discount testimony from these [nonmedical sources] if the ALJ 'gives reasons germane to each witness for doing so.'" *Molina*, 674 F.3d at 1111 (quoting *Turner*, 613 F.3d at 1224). "Further, the reasons germane to each witness must be specific." *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) (citation and internal quotation marks omitted).

### 2.    Analysis

Having reviewed the entire record, the court finds that the ALJ erred in analyzing the medical evidence. Specifically, the ALJ erred in rejecting the opinions of Ms. Kaftanski, failing to address Dr. Numah's findings, and discounting certain opinions of Dr. Sokkary. The Stars treaters, including Ms. Kaftanski and Dr. Numah, observed and treated Plaintiff over a period of nearly four years, i.e., September 2009 to July 2013. The Stars longitudinal treatment records and Dr. Sokkary's evaluation comprise the only evidence from treating and examining providers regarding Plaintiff's mental health. Given the length of time Plaintiff received ongoing treatment and evaluation from Stars providers, the Stars treaters appear to be in the strongest position to opine on Plaintiff's mental health status. This stands in stark contrast to sparse records from Dr. Whitehall, to whom the ALJ assigned great weight. Dr. Whitehall only saw Plaintiff three times for routine physical examinations, headache and vision issues, and apparently had no knowledge of Plaintiff's mental health treatment and evaluation through Stars. Furthermore, the ALJ should have assigned greater weight to Dr. Sokkary's opinions and erred in discounting certain opinions as vague. His opinions as a consultative examiner were consistent with those of the Stars treaters, and added credence to their opinions and findings regarding Plaintiff's mental health.

Given the consistency of the medical evidence from the Stars treaters and Dr. Sokkary, the ALJ erred in assigning great weight to the opinions of Dr. Whitehill, and substantial weight to the opinions of non-examining sources Dr. Davis and Dr. Solomon. Dr. Whitehill had little

interaction with Plaintiff, and none regarding his mental health. Drs. Davis and Solomon are state agency consultants who did not examine Plaintiff at all. They based their entire opinions on a review of medical records.

The court discusses each provider in turn.

### a. The Stars Treaters

Collectively, the Stars treaters assessed that Plaintiff had difficulty maintaining concentration, social interactions, and attendance during his entire four year attendance in the Stars program, from September 2009 to July 2013. *See, e.g*., A.R. 254, 282, 381-83, 389, 412-14. Relevant to the ALJ's opinion, Ms. Kaftanski diagnosed Plaintiff with generalized anxiety disorder, dysthymic disorder, and hyperkinetic syndrome, and assessed Plaintiff with a GAF score of 40. A.R. 28, 388, 413. Ms. Kaftanski's supervisor, Mariana Doig, MFT (Marriage Family Therapist), approved Ms. Kaftanski's diagnoses. A.R. 388, 413.

Plaintiff first contends that the ALJ erred in not affording greater weight to the Stars treaters because the ALJ's contention that Ms. Kaftanski and Ms. Doig were not acceptable medical sources was not a legally adequate reason to reject their opinions. The court agrees.

As one court in this district recently observed, this reason, "while accurate, is circular," and is not, by itself, a germane reason to reject an opinion or diagnosis from a nonmedical source. *Raven-Jones v. Berryhill*, No. 3:16-CV-03766-LB, 2017 WL 1477128, at *16 (N.D. Cal. Apr. 25, 2017) (The ALJ's reason for rejecting the opinion of Plaintiff's nonmedical social worker/case manager as not an 'acceptable medical source' was circular and ignored the probative value of the testimony) (citing cases).

While the Commissioner is correct that an opinion of an "acceptable medical source" is generally entitled to more weight than the opinion of a nonmedical source, *see Bennett*, 202 F. Supp. 3d at 1134, the "opinion from a 'non-medical source' who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source." SSR 06-03P (S.S.A.) ("Social Security Ruling), available at 2006 WL 2329939, at *6. As discussed in SSR-06 03P, "this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of

17

the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole." *Id*. A review of the Stars records shows this to be the case here.

Specifically, Ms. Kaftanski assessed Plaintiff both during his enrollment at Stars and upon his graduation from the program. Thus, her opinions are highly probative on the issue of Plaintiff's mental health. In February 2013, Ms. Kaftanski observed that Plaintiff experienced difficulty concentrating on assigned tasks and lacked appropriate coping skills, among other things, and diagnosed Plaintiff with generalized anxiety disorder, and assigned him a GAF score of 40. A.R. 388-389. In June 2013, upon Plaintiff's graduation from Stars, Ms. Kaftanski observed that Plaintiff largely struggled with social anxiety and continued to socially withdraw, and diagnosed Plaintiff with generalized anxiety disorder, dysthymic disorder, and hyperkinetic syndrome and assigned him a GAF score of 40. A.R. 412-13.

Additionally, Ms. Kaftanski's observations are consistent with those of other Stars treaters, which comprise a majority of the medical evidence in this case. *See, e.g.*, A.R. 246-320, 380-98, 412-34, 454-75. Plaintiff was in the Stars Day Treatment Intensive Program, which included weekly individual therapy and daily group therapy sessions, for a period of almost four years. A.R. 255-56, 381-98. Plaintiff saw several treaters during this time. A review of the Stars records shows that his treaters consistently observed that Plaintiff had difficulty with concentration and social interactions. A.R. 254, 282, 381-83. For example, as part of Plaintiff's January 2012 IEP, Mr. Mason observed that Plaintiff exhibited poor concentration and participation during group and activities. A.R. 254. In his therapy notes, Mason observed that Plaintiff exhibited excessive worrying and fear and experienced difficulty in social interactions including difficulty remaining in the group setting and shutting down when he was redirected by staff and held accountable. A.R. 381, 383. Additionally, in connection with Plaintiff's 2013 IEP, Ms. Jeanpierre observed that Plaintiff continued to display symptoms of anxiety, depression and withdrawal, and to exhibit social/emotional difficulties that interfered with his ability to function in the class environment. A.R. 282. Finally, Stars psychiatrist Dr. Numah's overall impression of Plaintiff was dysthymia. A.R. 473. Dr. Numah established certain objectives for Plaintiff to address his anxiety/worry, to

increase his assertiveness, and to have Plaintiff use coping skills to manage social situations.  A.R. 474.

Furthermore, Ms. Kaftanski's observations are consistent with those of Dr. Sokkary.  In April 2013, Dr. Sokkary interviewed Plaintiff and administered a battery of tests.  Dr. Sokkary diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood and borderline intellectual functioning, and opined that Plaintiff had "extremely low cognitive abilities;" struggled to understand, remember, and perform simple tasks; and struggled to maintain a sufficient level of concentration, persistence, and pace.  A.R. 401.

Plaintiff also argues that the ALJ erred because his other reasons for rejecting Ms. Kaftanksi's opinions were not germane to Ms. Kaftanski.  The court agrees.  After stating that Ms. Kaftanski was not an "acceptable medical source," the ALJ concluded that Plaintiff's diagnosed generalized anxiety disorder, dysthymic disorder, and hyperkinetic syndrome were "non-severe" because Plaintiff did not take any psychiatric medications, inconsistently attended group and individual therapy, exhibited limited improvement in his symptoms with increased attendance, and had not received any ongoing treatment for his mental impairments for 12 continuous months, *see* A.R. 28.  The court finds the ALJ's analysis problematic for two reasons.

First, as discussed, the ALJ was required to provide germane and specific reasons for discounting Ms. Kaftanski's opinions.  *See Molina*, 674 F.3d at 1111; *Bruce*, 557 F.3d at 1115.  The only actual reason the ALJ provided for discounting Ms. Kaftanski's opinions that was germane *and specific* to her opinions was the fact that Ms. Kaftanski and her supervisor, Ms. Doig, were not "acceptable medical sources."  A.R. 28.  As discussed above, this is not a sufficient reason for rejecting relevant opinions from a treater who saw Plaintiff over an extended period of time, evaluated his mental health status at various points in time, and provided opinions and diagnoses that were consistent with other record evidence, such as other Stars treatment providers and Dr. Sokkary's consultative examination.

Second, none of the remaining reasons provided by the ALJ for rejecting Ms. Kaftanski's opinions are specific or germane to Ms. Kaftanski.  In fact, the reasons appear to answer an entirely different question, namely, the severity of diagnosed generalized anxiety disorder,

19

dysthymic disorder, and hyperkinetic syndrome.

Plaintiff finally contends that the ALJ erred in failing to address the opinion of Stars psychologist, Dr. Numah. The court agrees. Dr. Numah incorporated the diagnoses of other Stars treaters into his treatment notes, and did not state any disagreement with them. A.R. 474. Additionally, Dr. Numah's impression and observations were consistent with those of other Stars treaters. Dr. Numah's overall impression of Plaintiff was dysthymia and Dr. Numah established certain objectives to decrease the frequency of Plaintiff's anxiety/worry and school avoidance/refusal, among other things. A.R. 474. These observations are echoed by other Stars treaters. *See, e.g.*, A.R. 282, 381, 383, 413. Dr. Numah's findings therefore appear to give credence to the findings and diagnoses made by the other Stars treaters. At a minimum, the ALJ should have evaluated Dr. Numah's findings and explain the reasons for rejecting the opinion and/or assigning it little weight.

In sum, the court finds that the ALJ erred in rejecting the opinions of Ms. Kaftanski and failing to address Dr. Numah in his decision.

### b.    Dr. Sokkary

Examining psychologist Dr. Sokkary opined that Plaintiff demonstrated a limited capacity and struggled to understand, remember, and perform simple tasks; and struggled to maintain a sufficient level of concentration, persistence and pace which indicated that Plaintiff would have some difficulty in "an environment that [his] health condition would allow." A.R. 401. Plaintiff contends that the ALJ erred in discounting these opinions as vague. A.R. 33.

Dr. Sokkary's opinions that Plaintiff "demonstrated a limited capacity" and "would have 'some difficulty in an environment that [his] health condition would allow'" are contradicted by Dr. Whitehill, who opined that there was nothing in the Kaiser records to indicate a functional disability, *see* A.R. 483, and Drs. Davis and Solomon, who opined that that Plaintiff could understand, remember, and carry out simple work instructions; could sustain concentration, persistence, and pace with his work tasks for 2-hour blocks of time, with customary breaks; and could adopt to a work setting that was simple and routine, *see* A.R. 70, 75, 86, 89. Accordingly, the ALJ was required to provide "specific and legitimate reasons" supported by substantial

evidence to discount Dr. Sokkary's opinions. *See Lester*, 81 F.3d at 830.

The court finds that the ALJ has not satisfied this standard. Dr. Sokkary's opinion that Plaintiff "demonstrated a limited capacity" is not vague when read in context of his entire report. As part of his report and examination, Dr. Sokkary conducted a WAIS IQ test. A.R. 401. Plaintiff's results demonstrated his "limited capacity," and his struggles to understand, remember, and perform simple tasks. Specifically, Dr. Sokkary observed that Plaintiff had a full scale IQ of 69, which was "in the extremely low range[;]" his scores on visual working memory were in the borderline range, and Plaintiff struggled to correctly complete the trails B test which indicated below than normal psychomotor speed, visual scanning, and mental flexibility. A.R. 401. Additionally, although Dr. Sokkary's specific statement that Plaintiff "would have 'some difficulty in an environment that health condition would allow,'" is not a model of clarity, this is beside the point. Dr. Sokkary's main opinions were that Plaintiff possessed a limited cognitive capacity and struggled to understand, remember, and perform simple tasks and to maintain a sufficient level of concentration, persistence and pace. A.R. 401. These opinions are consistent with the findings of Plaintiff's WAIS IQ test. A.R. 401. These findings are also supported by the opinions and observations of the Stars treaters. *See, e.g.*, A.R. 254, 383, 389.

Therefore, the court finds that the ALJ erred in rejecting certain opinions of Dr. Sokkary as vague.

### c. Dr. Whitehill

When asked to complete a Functional Capacity Assessment Form, treating physician Dr. Whitehill stated in an October 2, 2013 treatment note that "[t]here was nothing in the Kaiser record to indicate a functional disability." A.R. 483. The ALJ found this statement to be consistent with the Kaiser records, which indicated that Plaintiff had only intermittent complaints of headaches and fatigue and had received only conservative, routine treatment. A.R. 33.

Plaintiff contends that the ALJ erred in assigning great weight to Dr. Whitehill's October 2, 2013 statement because Dr. Whitehill is not a mental health specialist, and his statement was based on a minimal amount of contact with Plaintiff, was not consistent with the conclusions reached by Plaintiff's treating and examining mental health treaters, was based on erroneous

assumptions, and was unsupported by clinical findings or tests. The court agrees. Dr. Whitehill's October 2, 2013 statement on Plaintiff's functional disability should have been afforded limited weight for several reasons.

Dr. Whitehill's treatment of Plaintiff was limited to three occasions, and was primarily for routine physical examinations, headaches, and vision issues. A.R. 437-41 (June 27, 2013 general exam visit), 482-83 (October 2, 2013 general exam and blurred right eye vision visit), 477 (March 26, 2014 visit for headaches). Dr. Whitehill did not treat Plaintiff for a mental health related condition, and had no opportunity to observe Plaintiff clinically over a prolonged period of time like the Stars treaters. There is also no evidence to suggest that Dr. Whitehill was aware that Plaintiff had received longitudinal mental health treatment through the Stars program. Dr. Whitehill's only mental "evaluation" of Plaintiff occurred during the June 2013 visit, during which Dr. Whitehill noted that Plaintiff had "appropriate judgment & affect" and his "[m]emory [was] grossly normal." A.R. 438. However, this June 2013 observation has limited probative value and is unsupported by the weight of the record. The Stars treaters collectively opined that Plaintiff had difficulty maintaining concentration, social interactions, and attendance during nearly four years' attendance in the program. *See, e.g.*, A.R. 254, 282, 381-83, 389, 412-13. Additionally, examining psychologist Dr. Sokkary opined that Plaintiff demonstrated a limited capacity; struggled to understand, remember, and perform simple tasks; and struggled to maintain a sufficient level of concentration, persistence and pace. A.R. 401. Lastly, while Dr. Whitehill's October 2, 2013 statement is consistent with the opinions of non-examining state agency consultants Drs. Davis and Solomon, those opinions should not be entitled to substantial weight, as discussed below.

Dr. Whitehill's October 2, 2013 statement is brief, largely conclusory, limited to what Dr. Whitehill observed (or did not observe) in the Kaiser record, and is largely contradicted by the Stars treatment records, which constitute the majority of the record, *see* A.R. 246-68, 279-301, 380-398, 412-433, 454-475, and the opinion of examining psychologist, Dr. Sokkary. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) ("'[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective

medical findings.'") (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)) (emphasis in original omitted).

Therefore, the court finds that the ALJ erred in affording great weight to Dr. Whitehill's October 2, 2013 statement.

### e.    Dr. Davis and Dr. Solomon

Non-examining state agency psychological consultant Dr. Davis opined that Plaintiff could understand, remember, and carry out simple work instructions, and could sustain his concentration, pace, and his persistence with his work tasks for two hour blocks of time, with customary breaks, over the course of a regular workday and work week. Dr. Davis further opined that Plaintiff could interact with supervisors and co-workers he knows well, but would have difficulty interacting with the general public on a consistent basis; and could adapt to a work setting that is simple and routine. A.R. 70, 75. Non-examining state agency psychological consultant Dr. Solomon affirmed Dr. Davis's assessment. A.R. 86, 89.

Plaintiff contends that the ALJ erred in affording substantial weight to these opinions because the opinions of treating or examining physicians generally are entitled to more weight than the opinions of non-examining physicians, and these opinions are not consistent with any evidence in the record except for Dr. Whitehill's October 2, 2013 conclusory statement.

The court agrees. Drs. Davis and Solomon's opinions are not supported by the weight of the medical evidence in the record, as discussed in detail above. *See also* A.R. 254, 282, 381, 383, 389, 401, 412-13. The ALJ should have at least evaluated whether the opinions of the Stars treaters and consultative examiner Dr. Sokkary should have been afforded more weight than the opinions of these non-examining state medical consultants, especially given the Stars providers' extended observation and treatment of Plaintiff.

The court finds that the ALJ erred in affording substantial weight to the opinions of Drs. Davis and Solomon.

### B.  The ALJ's Evaluation of Plaintiff's Credibility

Plaintiff next contends that the ALJ erred in assessing his credibility. Specifically, Plaintiff argues that the ALJ did not provide clear and convincing reasons to find that Plaintiff's

testimony was not credible.

### 1. Legal Principles

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted). An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)). However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id.* at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is

malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's decision to reject a claimant's testimony. *See Burrell*, 775 F.3d at 1136.

### 2. Analysis

The ALJ found that Plaintiff's "medically determinable impairments reasonably could be expected to cause the alleged symptoms." A.R. 32. But, the ALJ further found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible" for two reasons. First, according to the ALJ, the medical evidence was "quite sparse" and did not show "ongoing treatment of a severe nature for 12 continuous months." A.R. 32. Second, the ALJ found that Plaintiff behaved normally at the hearing, i.e., Plaintiff had no problems sitting, standing, walking or testifying. A.R. 34. The court addresses each reason in turn.

First, the ALJ's evaluation of the medical evidence is problematic. The ALJ only reviewed a select handful of medical records including those from Dr. Whitehill, Dr. Sokkary, and non-examining state agency consultants including Drs. Davis and Solomon to conclude that the medical evidence "show[ed] no ongoing treatment of a severe nature for 12 continuous months". A.R. 32-33. The ALJ did not discuss the records of the Stars treaters, which comprise the majority of the medical records in this case and importantly show Plaintiff's treatment for various mental health related issues over a period of nearly four years. As discussed herein, the ALJ failed to give proper weight to the diagnoses of the Stars treaters. Additionally, the ALJ assigned great weight to the opinion of Dr. Whitehill and substantial weight to the opinions of Drs. Davis and Solomon. As discussed herein, the ALJ erred in assigning great weight to Dr. Whitehill because he treated Plaintiff in such a limited capacity and did not see Plaintiff for his mental health issues. The ALJ also erred in assigning substantial weight to the opinions of state agency consultants Drs. Davis and Solomon because they did not examine Plaintiff at all, and their opinions are inconsistent with other treating and examining sources. Accordingly, because the ALJ erred in his analysis of the relevant medical evidence, the court finds that the ALJ also erred in his credibility assessment,

which was based in part on his assessment of the medical evidence.

Second, the ALJ's assessment of Plaintiff's demeanor at the hearing is not reason alone to discredit Plaintiff. *See Orn v. Astrue*, 495 F.3d 625, 639–40 (9th Cir. 2007) (explaining that the ALJ "observations of a claimant's functioning may not form the sole basis for discrediting a person's testimony") (citation and internal quotations mark omitted). "Instead, [the] ALJ's personal observations may be used only in the overall evaluation of the credibility of the individual's statements." *Id*.

Therefore, the court finds that the ALJ erred in finding that Plaintiff's testimony was not credible.

### C.  **Plaintiff's Remaining Issues**

Plaintiff asserts four remaining points of error with the ALJ's determination. The court discusses each in turn.

First, Plaintiff argues that the ALJ erred in determining Plaintiff's RFC because the ALJ failed to include any impairments assessed by Dr. Sokkary, any functional limitations assessed by Drs. Davis and Solomon, and any findings of the Stars treaters. Because the ALJ erred in his overall weighing of the medical evidence, in particular discounting the opinions of the Stars treaters and not affording proper weight to the opinion of Dr. Sokkary, the court agrees that the ALJ erred in determining Plaintiff's overall RFC, which did not include the mental impairments assessed by Dr. Sokkary and the Stars treaters.

Next, Plaintiff contends that the ALJ erred in concluding that Plaintiff could perform other work at Step Five in his disability analysis. According to Plaintiff, had the ALJ included Plaintiff's concentration, memory, and social functioning impairments in his RFC analysis at Step Five, he would have concluded that Plaintiff was unable to perform any job. Additionally, Plaintiff also argues that the ALJ failed to address the discrepancy between Ms. Ferra's testimony that Plaintiff could perform work as a commercial cleaner and housekeeper and the DOT's descriptions of these jobs, which suggest that Plaintiff could not perform this work.

The court agrees. Had the ALJ properly considered Plaintiff's concentration, memory, and social functioning impairments at Step Five, the ALJ may well have concluded that Plaintiff could

not perform work in a competitive environment including work as a commercial cleaner and house keeper. According to the Stars treaters, Plaintiff struggled with concentration, social interactions, and attendance issues during his nearly four-year attendance at Stars. A.R. 254, 282, 381-83, 389, 412-13. Additionally, Dr. Sokkary similarly observed that Plaintiff had difficulty maintaining concentration, persistence, and pace in simple tasks. A.R. 401. Furthermore, Ms. Ferra testified that an individual with Plaintiff's restrictions including the inability to maintain concentration, persistence, and pace up to two hours unsupervised and the propensity to engage in conflicts with co-workers, supervisors, and the public would be unable to perform work in a competitive environment including work as a commercial cleaner and housekeeper. A.R. 62-63. Since the court finds that the ALJ erred in failing to assessing Plaintiff's concentration, memory, and social functioning impairments at Step Five, the court does not reach the issue of whether the ALJ erred in failing to address the discrepancy between Ms. Ferra's testimony and the DOT's job descriptions.

Next, Plaintiff argues that the ALJ erred in finding that Plaintiff's impairments did not meet the criteria of Listing 12.05(C) which requires that Plaintiff demonstrate that he has: "1) subaverage intellectual functioning with deficits in adaptive functioning initially manifested before age 22; (2) an IQ score of 60 to 70; and (3) a physical or other mental impairment causing an additional and significant work-related limitation." *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013). The ALJ found that Plaintiff did not meet the requirements of Listing 12.05(C) because while Plaintiff had a valid full scale IQ of 69, the evidence in the record did not demonstrate that Plaintiff had "an additional or other physical or mental impairment imposing an additional and significant work-related limitation of function." A.R. 29. Since it is unclear what the basis for this statement was (since the ALJ did not explain what evidence in the record he relied on), the court finds it appropriate to remand this issue for consideration upon a proper evaluation of all the relevant medical evidence, consistent with this opinion.

Finally, Plaintiff contends that the ALJ erred in determining that Plaintiff's anxiety and depression were not severe at Step Two. According to Plaintiff, had the ALJ not erred in rejecting the opinions of the Stars treaters and Dr. Sokkary, and Plaintiff's own testimony, the ALJ would

have concluded that Plaintiff's anxiety and depression were severe impairments at Step Two. It is unclear from this record how the ALJ would have evaluated Plaintiff's anxiety and depression at Step Two. Therefore, the court finds it appropriate to remand this issue for consideration upon a proper weighing of all the medical evidence, consistent with this opinion.

In sum, the court finds the ALJ erred in (1) determining Plaintiff's RFC and (2) concluding that Plaintiff could perform other work at Step Five and remands these issues to the ALJ for further proceedings consistent with this opinion. The court remands the issues of whether Plaintiff's anxiety and depression were severe impairments at Step Two and whether Plaintiff meet the criteria of Listing 12.05(C), in light of the need for further development of the record on these issues.

### D. Remand

A court may remand a disability case for further proceedings "if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). It may only remand for benefits, on the other hand, "where the record has been fully developed and further administrative proceedings would serve no useful purpose." *Id*. In determining whether to remand for benefits, the Ninth Circuit has devised a "three-part credit-as-true standard." *Garrison*, 759 F.3d at 1020. Each part of the standard must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id*. A court is required to remand for further development of a disability case when, "even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Id*. at 1021.

In this case, the court finds that further administrative proceedings would be helpful in determining Plaintiff's functional capacity upon the proper weighing and evaluation of the medical evidence and Plaintiff's testimony. For the reasons set forth in this order, the court therefore denies Plaintiff's request to remand for benefits.

**VII. CONCLUSION**

For the foregoing reasons, the court grants in part and denies in part Plaintiff's motion for summary judgment and grants in part and denies in part the Commissioner's cross-motion for summary judgment. The court remands this action for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 13, 2017



IT IS SO ORDERED.
Donna M. Ryu
United States Magistrate Judge